For this morning is number 21-10107 Freeland v. North Georgia Turf Inc. Good morning. May it please the court. My name is Nina Mabergmar and I represent Charles Freeland in this case. This case is before the court because Mr. Freeland was terminated by NG Turf for filing a charge of discrimination with the EEOC. We submit that the district court's reasons for granting summary judgment on Mr. Freeland's retaliation claim run afoul of the Supreme Court's decision in Bostock v. Clayton County. Mr. Freeland is an African American employee who worked for NG Turf for 20 years, starting when he was only 12 years old. It's safe to say that few people knew Mr. Freeland as well as Mark McWhorter, the company's president and the relevant decision maker in this case. Because of the special relationship between McWhorter and Mr. Freeland, Freeland served as a spokesperson for other African American employees in the company and would voice opposition on their behalf to disparate treatment in the workplace. McWhorter was familiar with Freeland's oppositional activity and rather than viewing it as a legitimate effort to enforce the rights of Black workers, viewed Freeland as having an attitude issue and difficulty getting along with others. The August 20, 2018 incident was just the last of many occasions where Mr. Freeland engaged in opposition conduct and was subsequently counseled by McWhorter. McWhorter refused to hear Freeland's side of the story and gave Mr. Freeland a one-week suspension in the hopes that Mr. Freeland would, quote, calm down and try to be easier to get along with upon his return. But when McWhorter learned a few days into the suspension that Mr. Freeland had filed a charge of discrimination with the EEOC, he changed the one-week suspension into a permanent termination. Can I ask you about that? Yes. So, it seems to me that this is, you know, we have Mr. McWhorter who says, I never knew that Mr. Freeland filed the EEOC charge. And we have Mr. Freeland who in his sworn declaration and in his deposition under oath has said, no, you actually did know that I filed an EEOC charge. So when I looked at the deposition, at Mr. Freeland's deposition and his declaration, I was struck by the fact that he has no personal knowledge that Mr. McWhorter knew about the EEOC charge. In fact, he says, no, you know, the reason I know Mr. McWhorter knows is because Mr. Boswell told him that I had filed an EEOC charge. And then I think he also brought up two other gentlemen who heard that conversation from Boswell. And if I'm getting names wrong, please correct me. Mr. Kevin Rice and I think Lonnie Ellison. But we don't have in the record any deposition of Mr. Boswell, Mr. Rice, Mr. Ellison. We don't have a declaration from any of those three gentlemen. Is that correct? That's correct. Okay. So I understand what our case law is and it has to, when you're opposing a motion for summary judgment, you can, you have to be able to reduce this to admissible evidence. But here we have a situation where in the defendant's reply to the defendant's motion for summary judgment, the defendant objected to this hearsay, both in footnote two of its reply and on pages five to six pointed out that plaintiff does not have any direct knowledge about the conversation between Boswell and McWhorter. He was not present for the conversation, so he can only proffer hearsay. So having the defendant object to this use of hearsay, does that, how does that change the dynamic, if at all, about this dueling very important fact? Okay. So at the summary judgment stage, the court may consider hearsay evidence as long as it could be reduced to admissible evidence at trial. Here we could easily depose Mr. Boswell at trial and ask him, what did you tell Mr. Freeland? Or sorry, Mr. McWhorter. But there is no deposition and there's no declaration in the record even following this reply from defendant, correct? Correct. But we could call Mr. Boswell as a witness at trial and thus we could reduce this currently hearsay evidence to admissible evidence at trial. And accordingly, the court is allowed to consider the hearsay evidence at the summary judgment stage. Is that an abuse of discretion standard, whether the district court acted properly in considering that evidence? Well, so here the district court actually ruled in our favor and said that, you know, we can consider this evidence. And we assume for purposes of summary judgment that he did say to McWhorter that there was an EUC charge file. So the district court actually ruled correctly, we submit, on that issue. Well, the district court did say, we're just, they set out the dispute, they pointed out it was hearsay, the district court did. And the district court judge said, but we're just, we're going to assume that for now and moved on to decide summary judgment on another, another basis, correct? Correct. We submit that the district judge recognized that he could consider this evidence at the summary judgment stage. As I understand it, Mr. Boswell, at this time, still works for the company? If he currently works for the company? Yes. Well, or when the summary judgment pleadings were being filed. That's my understanding. I'm not sure if he currently works at the company. Okay. And, but this is such a key piece of evidence as to whether or not he knew whether he had gone to the EEOC or was going to sue, it doesn't really matter. Going to sue, or they use the word, there seems to be some dispute, rather, with it. He just heard, he's going to sue or he's gone to the EEOC, it doesn't really matter. But this is such a key piece of evidence. Correct. And it will. Out of the whole thing. It's not in the record. We don't know what Mr. Boswell's going to say. Correct. Correct. And we agree, and that's definitely going to be an issue that the jury will have to resolve. We also would submit that there is. How is the jury going to have to resolve it if Mr. Boswell says, no, I didn't tell him? And then there's no conflict. And then the jury could find that the defendant did not have knowledge of the protected activity. But we would also submit that there is circumstantial evidence that suggests he knew, even if Boswell only told him that he's trying to sue you. There's a lawsuit. There's circumstantial evidence suggesting that he very well knew what the lawsuit would be about on the very same day. I agree with you. It doesn't really matter whether he says he's trying to sue you or he's going to the EEOC. I agree. Whatever. Either one would probably be enough. But the problem is we don't know what was said. Ms. McWhorter denies it. And neither Boswell, Rice, or Elson. Correct. And it's a significant factual dispute. And when there is a significant factual dispute, that must be determined by the jury and not the judge. I guess what we're getting at is we're trying to determine if there is a factual dispute. Correct. And we would submit that, yes, there is a factual dispute. You have, you know, Mr. Freeland's testimony saying one thing, McWhorter saying another. A lot of those reduced to admissible evidence are cases where clearly what's going on is admissible evidence. It just hasn't been put in the record. The problem here is we don't know what the evidence is going to be. I mean, because it's a little different. But I'll have to read the cases and make sure it's like testimony that you don't really know what they're going to say. Like, there might be a previous statement like Mr. Boswell's made and somebody wrote it down or he signed some and it's not really admissible right now, but it can be reduced to admissible. It's a little different than this. But we would submit that even if you only take the defendant's argument and you exclude what Mr. Freeland testified about specifically mentioning the EEOC, even if you look plainly at what McWhorter said, he admitted. Okay. Help me with that. Tell me what McWhorter said. Okay. So McWhorter admitted that Boswell told him that Mr. Freeland was trying to sue the company. He says he didn't mention anything about the EEOC, that he doesn't know what the EEOC was, but he did mention a lawsuit. His claim, of course, is that, oh, I didn't know what the lawsuit was about. It could have been about anything. But there is other circumstantial evidence that goes beyond this Boswell testimony that shows that on the day that Mr. Freeland was suspended on August 20th, they had, McWhorter and Mr. Freeland had a conversation about Carter being a racist and that the conversation that led to Mr. Freeland allegedly blowing up Carter had to do with disparate pay facing black workers. McWhorter has also admitted in his testimony that Mr. Freeland repeatedly complained about Carter having racist tendencies. So this was nothing new. So to the extent there was a dispute between Mr. Carter and Mr. Freeland that led to the suspension and then led to Mr. Freeland trying to sue the company, I think a jury could infer from all of the circumstantial evidence that McWhorter very well knew what that lawsuit was about. Would you articulate what you think the test should be for pretext? So we... I mean, or maybe I should say the case is about pretext. Everybody agrees they gave a legitimate reason. They made that a prima facie case. You agree with that? Correct. And so we're all here all about enough evidence to go to the jury on pretext, right? Correct. All right. So articulate for me, not the evidence, but how you would state the pretext standard. So we're not arguing for any type of change in the existing law. We think that under existing case law in this circuit, we still proceed to trial. You know, we concede that we have to show that the protected activity was one but for cause of determination decision to the extent they're arguing that, you know, the bad attitude or the investigation that revealed the bad attitude was the only reason, you know, we would cast doubt on that and question, you know, show that that proffered reason is not worthy of credence. You're saying you'll take it on one but for a cause, whether that's been changed by recent Supreme Court precedent or it looks like it's going to be changed or what other circuits have done. You'll take the one but for cause and say you still prevail. You've met it head-on. Right. So we would say, yeah, we would submit that we should proceed to trial based on any standard, really. We have proffered sufficient circumstantial evidence that cast doubt on the proffered reason. We've shown that the proffered reason that McWhorter discovered some new evidence that he wasn't already aware of is unworthy of credence. We can show that McWhorter had all relevant knowledge available to him when he made the decision to suspend Mr. Freeland for one week. The only reason he changed that one-week suspension decision into a permanent termination is because he learned of the EOC charge. He knew everything else. Or at least of a lawsuit. Correct. Just a lawsuit based on discrimination. Correct. That is the only thing that changed between the suspension decision. I'm not saying it's right. They try to argue that what he learned was some conversation with, I guess, Carter that or at least he says that during the week's suspension, I found out more about how his attitude was and how disruptive it was and I so-called learned a lot more than what I did. Is that in the record or is that not right? So we would submit the defendant has learned the timeline of when McWhorter learned of certain information. A closer look at the record shows that Chris Carter provided a complete account of what happened on August 20th, that same day. So that was a day that McWhorter suspended. So you can't use that as for additional evidence of changing his view. Correct. Because he already knew about that. Is that the day with the wheels in the parking lot and all that kind of business and yelling and stuff? Correct. That was on August 20th. And what was the day he was suspended and then what was the day he was terminated? So August 20th is the incident in the car, the argument with Chris Carter. The suspension was that same day. Okay. For a week. Correct. And then the termination was the last day of the suspension, late at night, at Sunday via text message. And that was August 26th. Okay. Thank you. Thank you. You've reserved three minutes for rebuttal, Ms. Bergmar. Okay. Thank you. Ms. Peters. Good morning, Your Honors. My name is Lisa Peters and I represent North Georgia Turf in this appeal. Of course, North Georgia Turf is the former employer of the plaintiff in this matter. We respectfully request today that this court uphold the long and well-reasoned opinion of the district court below in finding that summary judgment is proper for all of Mr. Freeland's claims. Of course, this case started out with a lot more issues than what we are here today on, which is just retaliation. But as to the retaliation piece, I wanted to touch on Judge Branch's question and the first line of questions there, which is different than the district court held below when the district court held that a prima facie or assumed a prima facie case was met. And the big part being there that Judge Branch realized the defendant challenge was the knowledge factor and it would be our position as we brief below that there is not a question of fact as to knowledge. The only admissible evidence here is the testimony of Martin Warder. The plaintiff had the opportunity to depose individuals to make a question of fact, to be able to go to the jury, and that did not happen here. The only evidence that the plaintiff can cite to is, as you indicated, is hearsay testimony that the plaintiff said that Judge Juan Boswell told him that he told Mr. McWarder. And even that testimony by the plaintiff is inconsistent. At several times throughout his deposition, he claims, I know for a fact, that Boswell told Mark McWarder that I was going to go to the EEOC, but then he contradicted that testimony by saying, well, he said that he told them that I was going to sue them. That's repeated several times throughout the record. Does McWarder concede that he was told that Freeland was going to sue him even though there was no mention of the EEOC? Yes, ma'am. Yes, Your Honor. Absolutely. And so, if McWarder admits that he knew Freeland was going to sue him for discrimination, what's the difference that the EEOC, why does it matter that the EEOC wasn't mentioned specifically? The difference here really depends on, or is very important because of the way these cases are analyzed on either a participation clause or the opposition clause under the retaliation framework. If your protected activity is one that falls under the participation clause, then there's no good faith requirement. It is ultimately protected. You still have the causation requirement, but you kind of give, it's a given that it's a protected activity. However, if it's just a vague statement, hey, so-and-so is going to sue you without anything more, then it is our argument that we made before the district court level that that falls under the opposition clause. And as such, it wasn't made in good faith, and the first element of the prima facie case of retaliation wouldn't even be met before we even get to the causation element or pretext in this case. And just to clarify one point, Mr. McWarder has testified that he knew or had heard that Mr. Freeland might sue him, not sue for discrimination, just sue him. Just sue him. And there is evidence that Mr. McWarder was certainly aware that, for example, Mr. Freeland was objecting to being underpaid, what he perceived to be underpaid. So it could have been, for any number of reasons, he would be sued, correct? Absolutely, Your Honor, and I think your point is well taken and I'm going to steal it, is that just a vague reference of being sued, McWarder had no knowledge that it was because he objected to a race discrimination, especially when you look at the facts of this case. This is a plaintiff that grew up with Mark McWarder, the decision maker in this case, lived with him, has been employed with him off and on for 20 years. The plaintiff himself said he loves him, he is a father, and he is not racist. And I think that is very important when you look at the fact that there's new evidence that Mr. McWarder would automatically jump from a vague reference, hey, by the way, he's going to sue you, to a good faith complaint of race discrimination and knowledge of that. What was the conversation at the time he was suspended? What was that over? I thought that was about his complaining about racial remarks continuing after they had disciplined Mr. Carter, I guess it is. I thought when he got suspended, what did he get suspended for? He got suspended for his behavior on the morning of August 20th, and according to plaintiff, he was not complaining about race. He was complaining to Chris Carter, the on-site farm manager, that his pay was not correct. So it was only about pay? Yes. Wasn't it about pay that white folks were getting paid more and their hours were being shaved, African-Americans, their hours were being shaved? There was a racial component about the pay, right? There was a year before that. In 2017, he made allegations that the white farm manager was shaving him and his crews hours, and so he was getting- I thought that was the same thing for the suspension, too. No, Your Honor. This one was the 2018 complaint. In 2017, he complained about hours being shaved. In 2018, his complaint was his understanding of the incentive pay bonus, whether on how he was supposed to be paid for rolls versus pallets. This is a sod farm. And there was his misunderstanding about how that was applied. And he admitted in his deposition that he never knew how the white workers were getting paid or that they were getting paid any differently. He just assumed in 2017 that it was a racial issue with the shaving hours. So the morning of August 20th, when he approached Mr. Carter before work started that day, he was upset and they had a discussion about the pay. Mr. Carter tried to explain to him again how the incentive bonus works for rolls and pallets. He didn't like the answer. He sped across the parking lot backwards, slammed his truck and parked so hard that it later was determined that it broke the gear shifter handle. And he left. He called his wife to- All of us disputed. He said it was already broken. There's a video. Nobody looked at the video of the parking lot. So we don't really know what happened. Yes, Your Honor, I believe that- There's a disputed issue of fact about what happened that day. I believe it would be my position or the defendant's position that the only disputed fact in that situation would be if the gear shifter was damaged that day. Because plaintiff did testify later in his declaration that he had previously told Mr. McWhorter that there was damage to the truck. However, importantly, there's no disputed fact about what is relevant in this determination of what happened that week because Alvarez and our jurisprudence said it doesn't really matter what happened that day. It matters whether the decision maker had a reasonable belief that what was told to him was what happened that day. And so I do assert that that was not a question of fact that can be put to the jury only for the gear shifter. Well, I agree with you. It's about what he reasonably believed happened that day. So that brings us back to what Boswell told him. And he's admitted at least the part that says Boswell told him he was going to sue. Okay. Yes, Your Honor. But importantly, what the timeline that plaintiff proffers omits is that it didn't just end that morning with the phone call, the morning of August 20th, with the phone call between Mr. McWhorter and the plaintiff. Mr. McWhorter called plaintiff after hearing briefly from Mr. Carter, asked the plaintiff what happened there, what happened between you and Chris Carter. And the plaintiff in his deposition explained that he discussed the pay issues. He was trying, Mr. McWhorter was trying to explain to him the difference between rolls and pallets. And they got mad at each other and that Mr. McWhorter said, you know, your attitude, Mr. Carter said that you blew up on him. Your attitude is not acceptable. And they got so mad at each other, they hung up on one another. But it didn't stop there. There was . . . I want to make sure I understand something in this record because I think it is telling a little bit. It's understated he was never written up. This whole attitude business went on, he says, for quite a while. But there was never any written disciplinary. Have I got that right for Mr. . . . the plaintiff here? There was never any written disciplinary prior to this suspension. He was never written up about this so-called attitude business. Yes, Your Honor, and I believe . . . No supervisor, even the two white ones he claims used the N-word all the time and kept doing it after they were disciplined. He's never written up for anything. Yes, Your Honor. I believe you are absolutely correct. And that is . . . So he's never written up for 20 years. And so then we get this suspension for one week. And then during the end of the . . . during the suspension time, and he's not written up then. Well, that's all because of the August 20 thing. Okay, there's this big ruckus, August 20. But he's not fired. He's suspended. Was he . . . I couldn't find whether he was suspended with pay or without pay. We don't know. The record doesn't tell us. It never got that far to figure that out. Right. Okay. So then he calls him on, like she says, the Sunday night before and says, you know, whatever you . . . I found out . . . nobody likes working with you. Whatever he says, although nobody's ever complained or written him up or done anything. Right. And he says, you're fired. Yes, Your Honor. Don't come back. Yes, Your Honor. Why isn't that all together enough to go to the jury on pretext about what this is really about? I mean, it could be, I must say, it could be about wage, but it's just as equally it could be about race. I mean, because he's been complaining for 10 years about the racist environment. I think that's pretty well documented, right? Yes, Your Honor. Okay. Yeah, he does talk about pay too, but for 10 years he's been complaining about race. He's constant. Yes, Your Honor. And I think that the reason it should not go to the jury on that issue is because of the context of this case. Mr. McWhorter testified he treated him like family. Actually, that cuts against you as far as I'm concerned. It was so much like family. The fact that he's going to go sue me, I'm firing him for that. It actually can be really hurtful to you, I think. I wouldn't use that with the jury. Now, you get there, but I wouldn't go with that. I'm going to take your word for it and go to the other argument. Yeah, I just, you know, he's been there for 20 years. I love him. I've raised him. He's worked here for 12 years. I mean, since he's 12, all of that's true. We're like family. And I think all that was true. That was makes it more believable. It was the sue business. That's what really happened here. And if I can add to Judge Hall's question, there's also the fact there's evidence in the record that the normal disciplinary process required a write-up of incidents. It required documentation anyway. And there was no, as she said, no written documentation. And also that there was generally a progressive disciplinary plan, which was not followed here. So if you take all that and you wrap it together with the close temporal proximity between the protected conduct and the termination, why is that not enough to get to a jury on pretext? A couple of points on that one. Going away from the family, this is a, this is not a multi-state large employer. This is a small, independently run, family owned and operated farm. Yeah, but it's got 100 employees and they got policies and procedures, right? They have written policies and procedures. Yes, Your Honor. None were followed here. Well, that is, I believe, in the statement of the case made by Plaintiffs, they argue that the handbook, progressive disciplinary policy, says they have to do that. The language is quite clear that you may see a verbal discipline. You may get a written discipline. But it definitely states that any conduct. I think you're absolutely right about that. They have an option whether to do it. But the fact that they didn't here and they did with other employees, correct? I think there is evidence in the record that it's done with one other employee. And with Mr. Freeland, there was never any documentation. Even when he was hired seven times after being terminated or quit throughout, it doesn't negate the fact that he was hired, that he didn't file an application. There's no application on there. There's no, there is no written evidence of these behavioral problems. But his behavioral problems, I don't think, are a question of fact for the jury. Because even Plaintiff admits that Mr. McWhorter spoke with him many times, blew up on him, I think was the case, was the words he used in his deposition multiple times to discuss his attitude with fellow co-workers. And the discipline that has led to this lawsuit started before any protected conduct occurred. He was in fact suspended before Mr. Freeland the next day contacted the EEOC. So we already have the, I guess the record would reflect that this process, the suspension had in fact started before the EEOC was contacted. Is that right? Yes, Your Honor. And I think that's a good point. And especially when you look at the text message exchange where they said if, where Mr. McWhorter said clearly, if you cannot change your attitude and come here and work with others without conflict, stay gone. And it went back and forth with the Plaintiff with that. And I was always curious because everything about this case is attitude and work with others. Nobody goes below the level surface and says, what is this attitude business about? What is it? What is his attitude? There's evidence in the record that two employees, even black employees have quit because he's overbearing. He cusses at employees. He refuses to follow instruction unless it comes directly from Mark McWhorter. Chris Carter, the on-site farm manager, had to just quit giving him instructions because he was so difficult to manage. Even after Jatwan Boswell told him, told Mr. McWhorter that, that hey, Charles is going to sue you, the very next day or that night of, there was a verbal altercation where they all lived in the trailer park there by the farm that the police had to get called because he was threatening his own crew member, Jatwan Boswell, that Mr. McWhorter had to go pay to put Mr. Boswell up in a hotel room because Mr. Freeland was threatening him. You've answered my question. You're over, so, but that won't count against you. But you've answered it. Thank you. Thank you, your honors. So I want to address a few points that Ms. Peters made. First of all, I believe she was mistaken when she said that the August 20 conversation between Mr. Freeland and Mr. Carter did not have to do with racial pay discrepancies. Actually, the record shows otherwise. If you look at plaintiff's deposition pages 33 and 37, he testified that other team members, black team members, had asked him to talk to Carter about not being paid properly in comparison with white employees. So that was, in fact, the August. But does he go further and say what he told Mr. McWhorter in the conversation? Sorry, what Carter told? No. It says, you said plaintiff's deposition, he said other black team members were complaining. I'm asking, did he tell that to Mr. McWhorter, though? So it was a phone conversation. So we don't have a recording of the phone conversation. But yeah, he submits that he explained that situation to McWhorter. And then in a follow-up text message. That other black members were complaining. Right, that he was talking to Carter about pay discrepancies facing black workers on his team. And McWhorter, or Carter, also told McWhorter that, you know, Mr. Freeland threatened that no one on the team would work until they got pay right. So he knew this was not just Mr. Freeland complaining about his own pay. This was him complaining on behalf of the black workers on his team about the pay. Was Mr. Freeland's team entirely black workers? Correct. So, but I guess the point your opposing counsel made was that when the 2018 complaint was made about pay, Mr. Freeland had no knowledge that any other team comprised of black or white workers, how they were being paid. He was simply bringing the complaint that his entire team, which happened to be black, was not, didn't believe that they were being paid correctly. So the team members did tell him that they weren't being paid the same way as white employees. So for 2018. Correct. And then after the phone conversation with McWhorter about what happened that day, Mr. Freeland sent a follow-up text to McWhorter saying, you know, Chris don't like me. And no, he don't want me there. It's not because I'm a bad worker or I don't do what I'm told. It's because I'm black. And that text message was sent again on August 20, 2018. I think a jury could find it disingenuous to say that McWhorter had no idea that this had a racial component. Either way, what we're discussing right now is a fact issue that should be resolved by the jury. You know, we're not saying that the jury must find one way or another. We're simply saying there's a fact issue that should go to the jury. And we submit that, again, McWhorter had all the relevant information available to him when he made a decision to suspend for one week. The only thing that changed between that decision and the termination decision was knowledge of a lawsuit or an EUC charge that was probably related to some racial concern, race discrimination concerns. So we submit that under Bostock, this is a textbook case, but for causation. He only changed the one-week suspension into termination after learning of the protected activity. Stated differently, but for the EUC charge, Freeland would not have been terminated. So since Freeland is carrying his burden of presenting sufficient circumstantial evidence from which a jury could conclude that his EUC charge was a but for cause, summary judgment was improper in this case. And accordingly, we respectfully ask that the district court's granting of summary judgment  Thank you, counsel. Thank you. Court will be adjourned until 9 a.m. tomorrow morning.